THE GERMANIA BUILDING AND LOAN ASSOCIATION OF THE CITY OF NEWARK

*v.*

B. FRAENKEL REALTY COMPANY et al.

[Decided July 24th, 1913.]

1. While a mortgage to secure future advances is valid, yet, if it is optional with the mortgagee whether to make future advances or not, those made after notice of a subsequent encumbrance or transfer are not a prior lien.

2. *3 Comp. Stat. 1910 pp. 3302, 3303 §§ 14, 15,* limiting the right of the mortgagee under advance money mortgages given to secure building loans to claim only for moneys applied to the erection of the building, &c., while applicable between a lien claimant and the mortgagee, does not apply as between the mortgagee and mortgagor and those claiming under the latter by assignment, whose rights are governed by the principles relating to advance money mortgages.

3. Where a building and loan association accepted an advance money mortgage to secure a building loan, the association's right to control the application of the advances, when made, was only incidental to its right to sufficient security for the loan, and was a right, the exercise of which. as between it and the mortgagors, was optional with the association.

4. Where a realty company had executed an advance money mortgage to a building and loan association to obtain money to erect buildings, the

realty company's right to future advances, under the mortgage was an assignable property right, and, having been in part assigned, the assignee was entitled to receive the advances covered by the assignment as against grantees of the property who had notified the mortgagee not to make further advances.

5. After a valid assignment of future advances to be made under an advance money mortgage to a building and loan association, neither the assignor nor a subsequent assignee, standing on their rights, is entitled, as against the prior assignee, to revoke the assignment.

6. Where a mortgagor, under an advance money mortgage to a building and loan association, directed the association to pay to a lumber company $582.50 out of the third payment on the mortgage and a similar amount out of the fourth payment, making a total of $1,165 in two mortgages, &c., it was a sufficient equitable assignment; the test being whether the contract authorized the depositary to pay the fund directly to the assignee without further intervention of the debtor or party originally entitled thereto.

7. A mortgagor under an advance money mortgage to a building association directed the association to pay a lumber company $582.50 out of the third payment and a similar amount out of the fourth payment.— *Held*, that the order was not invalid because no further payments outside of the order were made on the mortgage; the association being bound and having held itself in readiness to make advances demanded until default of the mortgagor or abandonment of the contract, &c., so that, the contract for future advances being in force at the time of the assignment, the first payment thereunder would operate as the third payment, and the fourth payment, out of which the balance was payable, would become due at the latest when the association directed the commencement of foreclosure proceedings.

---

Heard on bills, answers and cross-bills and replications and proofs.

These two cases (consolidated for the purpose of hearing) are foreclosures of two advance money mortgages given to a building and loan association by a realty company, one of its shareholders, on procuring the loans, and the principal question is whether a certain order given by the realty company on the association for $1,165, which order was paid by the association, can properly be charged as an advance under the mortgages. The propriety of the payment and the validity of the order is disputed by the answers and cross-bills of the realty company and of grantees to whom the realty company conveyed its interest in the mortgaged premises and shares of stock after the making of the order and with notice of it, but before its actual

payment of the association. The payment was made after notice of the conveyance by the realty company. The right to deduct the payment depends, in my judgment, upon the decision of the question whether, as between the mortgagor and conflicting claimants under it, the association was bound to pay the order as an equitable assignment prior in time to the conveyances and not postponed by any special equities of the subsequent grantees. The facts proved at the hearing are in detail substantially as follows:

On or about July 21st, 1910, the Fraenkel Realty Company executed and delivered to the complainant, the Germania Building and Loan Association, two mortgages securing $4,500 each upon two separate properties, 203 and 205 Runyon street, Newark. The loans were taken out in connection with the ownership of shares in the association, and in the application for one of the loans of $4,500, in answer to the question, "Is any portion of this loan to be used in improving the property?" The answer was, "To be used to erect houses." The applications were granted, the applicant agreeing to pay a bonus or premium of two per cent. besides expenses of preparing and approving the necessary papers by counsel of the association. The applications were made on May 16th, and the loan was directed to be made on May 16th, 1910. Bonds and mortgages in the usual form on loans to members were prepared and executed. The bonds (in the penal sum of $9,000 each) were conditioned only for the payment monthly of $23 (dues on the twenty-three shares of the association), and $22.50 interest at six per cent. on the principal sum of $4,500, and also fines, forfeitures and other payments due as holders of the shares, and with the further provision that on six months' default in the payment of interest, the principal sum should become due at the option of the association. The mortgages (in the usual form) secured payment as provided in the bonds. The bonds and mortgages were dated June 20th, 1910, and the first monthly payment was fixed for July 11th, 1910, but the mortgages were not acknowledged until July 14th, 1910, and together with the bonds seem to have been actually delivered on or about July 19th, 1910, when the first payment or advance of $3,000 less dues and in-

terest upon the mortgages was made to the realty company pursuant to the application. The mortgages were recorded July 21st, 1910. By two written assignments, dated June 28th, 1910, the realty company also assigned to the association its right in the shares of stock (represented by two separate certificates for twenty-three shares each), each assignment being "as collateral security for a loan of forty-five hundred dollars on bond and mortgage." These assignments were delivered to the association with the bonds and mortgages. At the time of the original application, and of the execution of the mortgages, houses were in the process of construction and the mortgages were intended by the parties as mortgages not to secure the immediate loans of the money, but future advances thereon, up to the amount of $4,500 on each mortgage less the premium and expenses. This understanding is clear from the acts of the parties under the application and mortgage, and by the granting of the loans and the execution and delivery of the assignments of shares and bonds and mortgages under it, the association became obligated, in my judgment, to make to the mortgagee the future advances for which it received and held the securities. As to the terms and conditions which (as between the mortgagor and mortgagee) these advances were to be made, there is no evidence of any formal agreement by writing or otherwise, and the only agreement as to these terms and conditions is the implied condition, derivable from the nature of the transaction and the status of the parties in reference thereto, and the subsequent conduct of the parties relating to the advances. The advances being intended to be made on buildings in the course of construction which (as appears by the application for loans) constituted the main security for the loans, and the statutes relating to loans by the association to its members being limited to first liens of eighty per cent. of the value of the real estate (*P. L. 1906 ch. 54; Comp. Stat. p. 340 § 24*), it is clear that the conditions as to future advances must be held to have contemplated that at the time of making any future advances, the building and loan association had the right to require that the property should be free from liens and of a value twenty-five per cent. above the advance. Upon making the first advance of

$3,000, on July 18th, 1910, a committee reported in favor of making an advance of $1,500 on each house, and before making it, the realty company delivered releases of existing liens or postponement of any mechanics' liens "then existing or thereafter arising" for work or materials furnished for the erection of the buildings on the mortgaged property. These were dated July 1st, 1910, and the postponement of existing or future liens was signed by J. N. Holloway & Company (among others), to whom a few hundred dollars were then due, and the release (of existing liens only) was signed by Wolf, Stewart & Company (among others), to whom the realty company at that time owed about $685 for materials furnished for these buildings, and to whom also B. Fraenkel owed at that time an individual account for material furnished by them to him for other buildings. On signing this release, and from the $3,000 payment to the realty company, Wolf, Stewart & Company received a payment of $1,000 by the check of Mr. Gurney (the solicitor of the association), dated July 23d, 1910, payable to the realty company and endorsed to Wolf, Stewart & Company. This payment was credited by Wolf, Stewart & Company, not to the realty company account, but to Fraenkel's individual account, and therefore still left the realty company in debt for the $685 due on the materials already furnished for the buildings in question. Out of the first payment of $3,000, the checks given by Mr. Gurney to the order of the realty company (after endorsement by Fraenkel as president) were endorsed by him individually and apparently deposited to his individual credit, to the extent of $1,568, the association not undertaking through its attorney to supervise or be responsible for the appropriation of the money received by the realty company on the delivery by Fraenkel of the releases and postponement of liens. On August 12th another payment of $2,000 on account of the mortgage was made by a check of that date, given by the association, payable "to the order of B. Fraenkel Realty Co., or Charles B. Gurney, Atty." This check was delivered to Mr. Gurney, the attorney of the association, and after endorsement as attorney, deposited to the credit of his individual account in the Federal Trust Company. The minutes of the association do not show

any other report by the committee than a report of progress, or any direction by the committee or the board for this payment to the realty company on the mortgage. The payment, however, was made and Mr. Gurney subsequently gave his checks, dated August 13th, 1910, one of $300 and one of $1,700, to the order of the realty company, which checks were after similar endorsements, apparently deposited or used by B. Fraenkel individually. No further releases or postponements of liens seem to have been delivered in connection with this further payment to the realty company. On August 23d, 1910, the realty company (by Fraenkel, its president) signed and delivered to J. N. Holloway, then trading as Union Lumber Company, the following order:

"NEWARK, N. J., Aug. 23, 1910.

"*Germania B. & L. Assn.,*
    "*Newark, N. J.:*

"You may please pay to Union Lumber Co. $582.50 out of 3rd payment and $582.50 out of the 4th payment, total $1,165.11 on (2) mortgages $4,500 each now being taken by you on properties 203 and 205 Runyon St., Newark, N. J.

"B. FRAENKEL REALTY CO.,
        "B. Fraenkel, *Prest.*"

At the time of receiving the order, notes of the realty company had been given to the Union Lumber Company for the amount, one of which, for $448, was due on the date of the order, and two others due thereafter, one for $522.11, due September 14th, and one for $195, due September 2d. The Union Lumber Company signed on August 23d an agreement that on payment from the loan association of the order for $1,165.11 on that date, they would return their notes. Shortly afterwards Holloway, individually, and trading as Union Lumber Company, assigned to Herman C. Schneider, his claim of $1,165.11 against the realty company and also the above order, authorizing him to sign all releases and give all acquittances and receipts for the same to any claims for lumber sold to the realty company for said houses. This assignment, expressed to be for one dollar and other valuable considerations, was actually signed and delivered after the date of the order. (August 23d), but was dated August 15th, 1910, by direction of Mr. Schneider, in order to

make it of a date of some claim he had against Mr. Holloway. Mr. Schneider seems to have had business dealings with Holloway and the Union Lumber Company, and says that he received many notes from the Union Lumber Company, but cannot tell whether he received the three notes referred to in the agreement of August 23d. This order does not seem to have been formally presented to the association at the time of its delivery, but it was delivered with its assignment to Mr. Schneider, who, at that time, was and still is the president of the association. On September 23d, 1910, the association drew another check for $4,000 (being the amount of the balance of the entire loan of $9,000), this check being like its previous checks, drawn payable "to the order of B. Fraenkel Realty Co., or Charles B. Gurney, Atty.," and it was delivered to Mr. Gurney. Payment of this or any other amount on account of the loan was not directed to be made by the directors or officers of the association, and Mr. Gurney's statement is that the check was given for the purpose of closing the books for the annual statement, and making the statement of loans agree with the secretary's annual report. The final payment on the loan could not, according to the usual practice of the association, have been made until after the buildings were finished and the payment was recommended by the committee in charge of the loan and the approval of the board. At this time the buildings were not finished, and afterwards and before any further payments to the realty company, as contemplated by the order, the realty company discontinued work on the buildings, and by assignments dated January 7th, 1911, assigned to Wolf, Stewart & Company and Vreeland-Kearney Lumber Company, defendants in this suit, its interest in the stock of the association assigned by it as collateral security for the two loans of $4,500 each, and authorized and directed the association to credit all past and future payments on the stock to the assignees, and also to pay to the assignee the balance of the money due to it on account of the loans. Subsequently, and by deed dated January 24th, 1911, the realty company conveyed to the same persons the mortgaged premises "expressly subject to all encumbrances now thereon." These transfers were made, as Fraenkel and Wolf both say, upon an

agreement that the grantees were to take over what the realty company had and finish the buildings. Fraenkel says also that the grantees were to sell the buildings, pay all the claims, and if there was any surplus, turn it over to him. At the time of the conveyance, the realty company still owed to Wolf, Stewart & Company, one of the grantees, $685, and also owed the other grantees, the Vreeland-Kearney company, for materials furnished the houses, but the amount then due therefor to this company is not proved. On taking the conveyance no additional consideration was given, and according to the evidence of Mr. Schneider, which is not controverted by Mr. Wolf, the latter, at the time of taking the conveyance, knew that the order to the Union Lumber Company for $1,165 had been previously given by the realty company. At the time of these conveyances, by which the realty company turned over the premises, the buildings were unfinished, but the realty company had, according to Fraenkel's evidence, expended over $8,000 on the buildings, besides $1,000 for the lots. On January 26th, 1911, two days after the date of the deed, Mr. Gurney, who had retained the check of the association for $4,000 since its delivery to him, September, 1910, deposited the check to the credit of his personal account in the Fidelity Trust Company. On the 6th of February, 1911, a special meeting of the association was called, of which Mr. Wolf had notice, and at which the matter of paying the order for $1,165.11 was taken up. Mr. Wolf at this meeting protested against the payment of the order until after the buildings were finished, and either at this meeting or before, the association seems to have been notified of the transfer of the mortgaged premises and of the shares by the realty company, and that the grantees proposed to finish the buildings. And at this meeting Mr. Schneider applied for payment of the order, and offered his personal bond for $18,000 to secure the association against losses on the loans, and also agreed to complete the buildings "against the lumber bill of Holloway Lumber Company, $1,165." Over the protest of Mr. Wolf, and declining to hear his counsel, who had attended for the purpose, the board directed the payment of the order, and pursuant to this direction Mr. Gurney, on the following day, gave his check for

the amount of the order, $1,165.11, to Schneider, the bond of
Mr. Schneider having been given.   On the 20th of February, a
written notice was served on the association, on behalf of Wolf,
Stewart & Company, the Vreeland-Kearney Lumber Company
and the realty company, notifying them (among other things)
that the lumber company and Wolf, Stewart & Company held
the legal title to the mortgaged premises and were the owners
of the stock given to the association as collateral for the two
mortgages of $4,500 each; that these mortgages were for con-
struction loans to be used in erecting and finishing the build-
ings, and that the amount still due on the mortgages was not
sufficient to finish the buildings and pay the order of the lumber
company assigned to Mr. Schneider, the president of the asso-
ciation; that only a small part, if any, of the amount repre-
sented by the order, was for materials used in the buildings, and
that the order was void and of no effect.   The notice also de-
manded a statement of the amount due on the mortgages, and
that the association use the amount represented by the mort-
gages in finishing the buildings and the (payment of the) lien
claims against them.   After their protest and notice, the gran-
tees proceeded to finish the buildings at their own expense,
Wolf, Stewart & Company expending $1,263.69, and the other
grantees, $2,091.55.   Plans and specifications for the buildings
to be constructed had been given to the association on the ap-
plication for the loan, and according to the estimates on these
plans, made by the realty company, the value of the buildings
was to be $11,400.   The committee in granting the loan esti-
mated their value at $10,400.   Assuming Fraenkel's evidence,
which is not contradicted, to be correct, that he had expended
$8,000 on the buildings at the time of transferring the property,
and taking cost as a basis of estimating the value at the time of
ordering the payment of $1,165.11, on February 6th, 1911, the
advance of this additional amount would clearly have been
within the statutory limit of eighty per cent. of the value of
the property.   The dues and interest on the shares, while the
realty company held them, had been retained by Mr. Gurney
on the moneys received by him for payment to the realty com-
pany, and the dues and interest for August and September,

1910, being $182, as well as the premium on the loan, were charged by him against the payment of $4,000 made to him by the check of the association on September 23d, 1910, under the circumstances above stated.

Neither the realty company nor its assignees and grantees ever paid any interest or dues, as required by the terms of the bond and mortgage, after September, 1910, and on July 17th, 1911, after more than the six months' default limited by the mortgage, the association exercised its option under the mortgage of declaring the whole principal due, and directed bills to foreclose the mortgages, which were filed August 14th, 1911.

On August 21st, 1911, Mr. Gurney returned to the association the balance of the $4,000 payment made to him in September, 1910, after deducting the payment of the order.

Complainant claims as due upon the mortgages the amounts actually advanced to the realty company thereon, including the $1,165 order, together with the premium on the loan and interest and dues, payable under the terms of the mortgage, up to July 17th, 1911, being $7,002.59, with interest on that sum from that date.

Defendants deny the validity of the payment of the order as an advance under the mortgage, and also claim that only the actual advances to the realty company are recoverable under the mortgages.

*Mr. Charles B. Gurney* and *Mr. Frank E. Bradner,* for the complainant.

*Mr. Hugo Woerner,* for the defendants.

EMERY, V. C. (after statement of facts and issues).

Mortgages to secure future advances are valid, but where it is entirely optional with the mortgagee, whether to make future advances or not, advances made after notice of a subsequent encumbrance or transfer are not chargeable. *Heintze* v. *Bentley, 34 N. J. Eq. (7 Stew.) 562, 566 (Court of Errors and Appeals, 1881).* This case at bar raises the different question as to the rights of conflicting claimants under the mortgagor where, on the

delivery of the mortgages the advance was not optional.    On the facts above stated, and in view of the application for loan and the granting thereof, and the actual execution and delivery of the bonds and mortgages, it is clear that the mortgages in question were mortgages upon which the mortgagee, the association, was obligated on its part to make advances to the realty company to the extent of the mortgages.    That the mortgages were of this character is not contested by defendants' brief, but the right to charge the payment of the order as an advance under the mortgage is disputed upon several grounds:

*First.* Because the association had no right to make advances or payments under the mortgages, except for the payment of debts incurred in the erection of the houses on the mortgaged premises.    If this were a question between lien claimant and mortgagee under their lien law, as to their respective rights under advance money mortgages (*P. L. 1895 p. 313*), the objection might be good, but as between mortgagee and mortgagor and those claiming under the latter by assignment, the provisions of this statute limiting the mortgagee's rights are not applicable, and their rights are to be governed by the general principles relating to advance money mortgages.    Any right of the association to control over the application of the advances was only incidental to their right to sufficient security for the loan, and was a right, the exercise of which (as between them and the mortgagors) was optional as being intended solely for their protection.

It was not a right which the association could be required to exercise for the benefit of the mortgagors, or as between adverse claimants under them.    On none of the previous advances had any such right of control been recognized, and the realty company on receiving them had apparently used them (or a large part of them) to pay debts not arising out of the construction of the buildings, and $1,000 of the first advance was paid to Wolf, Stewart & Co., who applied it to Fraenkel's individual account, leaving the amount then due for material used in the buildings ($685) still unpaid, and due when they took over the property.

*Second.* Because it was an advance made after notice of the conveyance of the premises subject to the mortgages to the de-

fendants and against their protest. This contention is based on the claim that the grantees took the premises subject only to the advances then actually made by the mortgagors, and ignores any rights in the mortgagors, or those claiming under them, to any of the future advances, except to the extent to which these rights have been actually realized or carried out, at the time of the conveyance. As it seems to me, this claim is not well founded, and for this reason: The right of the mortgagor at any fixed or specific time to future advances under the mortgage is a property right existing at that time, and as such is, in equity at least, assignable. And when the mortgagor has duly assigned, either wholly or in part, his right thereafter personally to receive the advances, the assignee is entitled to receive the advances from the mortgagee, and is so entitled by virtue of the assignment and as deriving right thereto at that time.

As to the vesting and priority of estates and rights the general rule applicable both in law and equity, as between the assignor or those standing in his stead and the assignee is *"qui prior est tempore potior est jure."* *Jenkinson* v. *N. Y. Finance Co.,* 79 N. J. Eq. (9 Buch.) 247 (1911).

The precise question then is not, as defendants claim, whether under a mortgage for future advances, the mortgagor or his grantees have generally the right to require future advances to be discontinued, but whether the mortgagor having assigned to one person for value the right to a portion of the future advances to which he is at the time of the assignment entitled, has himself the right to revoke the order or does, by a subsequent conveyance of the mortgaged property to a grantee standing only on the assignor's rights, confer on such grantee the right to countermand the advance previously directed by the grantor, and solely upon the ground that it has not been paid.

The grantees of the mortgaged property in this case were also assignees of the shares of stock and of the mortgagor's right to future advances payable by the mortgagee after the assignment, and having notice of the previous assignment, stand in the stead of the assignor, and payments on orders previously given which

were valid assignments as against the realty company, are also valid as against them.

My view is that after a valid assignment of future advances neither the assignor nor the subsequent assignee, standing only on his rights, has the right, as against the prior assignee, to revoke the assignment. This conclusion leads to the consideration of the third objection.

*Third.* That the order itself does not operate as an equitable assignment. Neither of the two reasons relied on to support this objection is valid. The first is that the order is not an imperative direction for payment out of any fund, its language being: "You may please pay to Union Lumber Company $582.50 * * * out of third payment, and $582.50 out of fourth payment, total $1,165.11, on two mortgages," &c. No particular form of words is necessary to constitute an equitable assignment, and if the writing or act indicates the intent of the assignor to make an appropriation of the fund or part of it, it will in equity be enforced as an assignment. *Weaver* v. *Atlantic Roofing Co.* (*Vice-Chancellor Grey, 1898*), *57 N. J. Eq.* (*12 Dick.*) *547,* and cases cited (at *p. 553*). The test to be applied in the case is whether the contract or agreement in question between the assignor and the assignee authorized the depositary of the fund to pay it directly to the assignee without the further intervention of the debtor or party originally entitled to it. *Lanigan* v. *Bradley & Currier Co.* (*Vice-Chancellor Pitney, 1892*), *50 N. J. Eq.* (*5 Dick.*) *201, 206.* Treated merely as a matter of its construction, the written order meets this test. So far as the form of the order is concerned, and for the purpose of directing control of the fund, authority to the depositary to make the payment to the assignee is equally effective with a positive direction to pay. And where there is a good consideration for the assignment, the real nature of the transaction rather than the mere form of it, including all the acts of the parties in reference thereto, as well as the written documents must, as between them, be considered to decide the question of assignment. *Malcolm* v. *Scott, 8 Jur. 283; 3 Har. 39* (*Vice-Chancellor Wigram, 1844*). The Union Lumber Company, the name under which J. N. Holloway carried on busi-

ness, had furnished materials for the construction of the building at the time of the first $3,000 payment to the realty company under the mortgage, and had for the realty company's benefit postponed its existing and future liens to the mortgages in question, in order that it might receive this payment. And at the time of receiving the order in question the lumber company further agreed upon payment to deliver up certain notes of the realty company, one of which was due on the receipt of the order. Substantially the order was delivered as security for existing and future debts for part of which security was released, and it was therefore upon good consideration. The *second reason* urged against the validity of the order as an assignment is that the order authorizes or directs payment out of the third and fourth payments on the mortgages, and it is claimed that as no further payments (outside of the order) were ever made under the mortgage, the orders were not according to their terms ever effective. There has been no proof as to any agreement between the realty company and the association in reference to the number and time of payments, and as to number of payments the only proof is that by two previous payments a portion of the advances had been made. At the time of giving the order the realty company were proceeding in the construction of the buildings and the association also still held itself in readiness to make the advances, and did in fact subsequently and while the realty company was still constructing the buildings, set aside funds by its check to Mr. Gurney for the balance of the advances. The association on its part was obligated to continue the mortgage as one for future advances until by six months' default of the realty company or its assignees and grantees to make the payments required by the mortgage, or for some other abandonment of the contract by the mortgagor, the principal of the mortgage became due and the contract for future advances terminated by the act of the realty company or its grantees. At the time of directing the payment the obligation for future advances was still in force and the right to them had been assigned to and was held by the grantees who gave notice of their rights. The grantees protested against the payment of the order at any time or out of any funds, on the

ground that if paid there would not be money enough left to finish the buildings, but did not then abandon or give up the contract for future advances under the mortgage. The subsequent abandonment of the contract for future advances by the grantees, by their failure to make the payments called for by the mortgages, did not give them or the realty company the right as against the association, or against the prior assignees of the future advances, to set up that the time for third and fourth payments never arrived. If the contract for future advances was in force, the payment in question was in fact the third payment, out of which one-half of the order was payable, and the fourth payment, out of which the balance was payable, would become due, at the latest, when the foreclosure was directed, and the whole amount of the order being then due and payable, the complainant was then entitled to recover the amount paid on the order as an advance to the realty company under the mortgages.

Decree including this payment will be advised, and the amount due will be settled on the usual basis, including interest, dues, &c., up to the time of complainant's exercising its option of declaring the principal due because of default.