NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2890-13T3

ROSENTHAL & ROSENTHAL, INC.,

    Plaintiff-Respondent,

v.

VANESSA BENUN a/k/a VANESSA
BROOCHIAN and ELAN BROOCHIAN,

    Defendants,

and

RIKER, DANZIG, SCHERER,
HYLAND & PERRETTI, L.L.P.,

    Defendant-Appellant.

| APPROVED FOR PUBLICATION |
| :---: |
| **June 17, 2015** |
| **APPELLATE DIVISION** |

_____

Argued April 15, 2015 — Decided June 17, 2015

Before Judges Fuentes, Ashrafi, and
O'Connor.

On appeal from Superior Court of New Jersey,
Chancery Division, Monmouth County, Docket
No. F-6301-12.

Gerald A. Liloia argued the cause for pro se
appellant (Nicholas Racioppi, Jr., of
counsel; Matthew H. Lewis, on the brief).

Joshua A. Zielinski argued the cause for
respondent (McElroy, Deutsch, Mulvaney &
Carpenter, L.L.P., attorneys; Mr. Zielinski

and Peter Saad, of counsel and on the brief).

The opinion of the court was delivered by

ASHRAFI, J.A.D.

In this foreclosure action, defendant-mortgagee Riker, Danzig, Scherer, Hyland & Perretti, L.L.P., (Riker) appeals from summary judgment granting priority to the two earlier, recorded mortgages of plaintiff-mortgagee Rosenthal & Rosenthal, Inc. (Rosenthal). The Rosenthal mortgages secured not only existing debts guaranteed by defendant-mortgagor Vanessa Benun but also future advances Rosenthal would make in its discretion to the debtor. Riker argues that the Chancery Division incorrectly applied the common law of optional future advances secured by a mortgage. We agree and reverse.

Both parties filed motions for summary judgment. The pertinent facts are essentially undisputed. Our standard of review is plenary on the application of law leading to summary judgment where no genuine issues of fact are in dispute. Nicholas v. Mynster, 213 N.J. 463, 477-78 (2013); Zabilowicz v. Kelsey, 200 N.J. 507, 512-13 (2009).

Riker is a law firm. Rosenthal describes itself as "an international financial institution engaged in providing businesses with . . . traditional factoring services, which involves businesses selling their accounts receivable to

Rosenthal, in return for cash to satisfy their immediate cash flow needs." See also 35 C.J.S. Factors § 1 (2009) ("factoring" defined as the sale of accounts receivable at a discounted price). Both Riker and Rosenthal are creditors of Jack Benun or the camera sales businesses that were owned by the Benun family, which we refer to in this opinion as "the Jazz entities."

On July 12, 1995, Rosenthal entered into a factoring agreement with one of the Jazz entities, Jazz Photo Corporation (Jazz Photo). Paragraph 7(b) of the 1995 factoring agreement provided that Rosenthal, "will advance to" Jazz Photo "at [Rosenthal's] discretion, up to seventy percent (70%) of the net amount of receivables purchased by [Rosenthal] and not as yet collected."

On August 18, 2000, defendant Vanessa Benun, who is Jack Benun's daughter, executed an agreement by which she guaranteed to Rosenthal payment of all obligations, liabilities, and indebtedness of Jazz Photo. Vanessa Benun also executed a mortgage and security agreement (the 2000 mortgage), encumbering real property she owned on Ivy Place in Ocean Township. The 2000 mortgage included a "dragnet clause," which secured Vanessa

Benun's obligations under the guarantee up to a maximum principal amount of $1,000,000.[1]

The 2000 mortgage also contained an "anti-subordination clause," which stated that Vanessa Benun "shall not further mortgage or amend, modify, restate or amend any existing prior mortgage or otherwise encumber the Premises, or any part thereof."  The 2000 mortgage was recorded in the Monmouth County Clerk's Office on August 21, 2000.

---

[1] A dragnet clause is used in conjunction with one type of future advance mortgage.  Grant S. Nelson & Dale A. Whitman, Rethinking Future Advance Mortgages: A Brief for the Restatement Approach, 44 Duke L.J. 657, 671-73 (1995).  Dragnet clauses typically state that if the borrower ever becomes liable to the lender on any other loan, the mortgage will also secure that loan.  Id. at 671.  "The purpose of the dragnet clause is to provide a sort of contingent cross-collateralization; if any other loan is made in the future, the presently mortgaged real estate will serve as additional collateral for it."  Id. at 671-72.

The dragnet clause in this case provided that the 2000 mortgage would secure, up to its principal limit:

> all obligations and indebtedness of every kind and description of Mortgagor to Mortgagee or any of its affiliates, whether primary or secondary, absolute or contingent, direct or indirect, sole, joint or several, secure or unsecured, due or to become due, contractual, tortious, arising by operation of law or otherwise, or now or hereafter existing, and whether incurred as principal, surety, endorser, guarantor, accommodation party or otherwise, including, without limitation, principal, interest, fees, late charges and expenses, including attorneys fees and/or allocated fees of Mortgagee's in-house legal counsel . . . .

A-2890-13T3

On March 8, 2005, Rosenthal entered into a second factoring agreement with another of the Jazz entities, Ribi Tech Products, LLC (Ribi Tech). Paragraph 7.2 of the second factoring agreement stated that in its "sole discretion," Rosenthal "will, from time to time . . . advance to [Ribi Tech], sums" up to a maximum calculated as a fixed percentage of outstanding "Eligible Receivables" or "Eligible Inventory."

On March 15, 2005, Vanessa Benun executed another agreement by which she guaranteed to Rosenthal payment of all obligations, liabilities, and indebtedness of Ribi Tech. Vanessa Benun also executed another mortgage and security agreement (the 2005 mortgage), further encumbering the Ivy Place property, again in the principal amount of $1,000,000. The 2005 mortgage contained the same dragnet and anti-subordination clauses as the ones in the 2000 mortgage. The 2005 mortgage was recorded in the Monmouth County Clerk's Office on April 13, 2005. At some point, Ribi Tech changed its name to Jazz Products, LLC (Jazz Products).

On March 25, 2007, Vanessa Benun executed a mortgage in favor of Riker (the Riker mortgage) on the same Ivy Place property. The purpose of the Riker mortgage was to secure payment of outstanding legal fees totaling $1,679,701.33 owed to Riker as of that date by Jack Benun. The Riker mortgage was

recorded in the Monmouth County Clerk's Office on April 13, 2007.

On August 3, 2007, Rosenthal's counsel sent an e-mail to Riker that took notice of the Riker mortgage. Counsel wrote: "title on the daughters properties show liens in favor of your firm. Those liens will need to be fully subordinated to any new [Rosenthal] mortgages on the daughters properties . . . ."[2]

On September 8, 2009, Jazz Products filed for bankruptcy. The next day, Vanessa Benun executed a third agreement by which she guaranteed to Rosenthal payment of all obligations, liabilities, and indebtedness of Jazz Products as a debtor in possession.

Pursuant to paragraphs 7(b) and 7.2 of the 1995 and 2005 factoring agreements, Rosenthal continuously disbursed and collected funds from the sale of accounts receivable of the Jazz entities, at the same time charging the Jazz entities fees, commissions, and other charges referenced in the agreements. It also made advances to the Jazz entities every month between June 2006 and August 2009. Once Jazz Products filed for bankruptcy, Rosenthal declined to make additional disbursements and advances except for a few that were intended to complete the bankruptcy

---

[2] Another of Jack Benun's daughters had also provided a mortgage to secure the debt to Riker.

liquidation process. Jazz Products defaulted on the factoring agreements by failing to make the required payments. As of March 2012, Jazz Products and Vanessa Benun owed Rosenthal $3,986,724.19.

After Riker recorded its mortgage in April 2007, it also continued to perform services for Jack Benun. In April 2013, at the time of the motions for summary judgment, Jack Benun owed Riker more than $3,000,000 in legal fees.

To recapitulate, Rosenthal had two mortgages on the Ivy Place property recorded in 2000 and 2005, and Riker had a subsequent mortgage on the same property recorded in 2007. The value of the mortgaged property was not sufficient to secure the debts owed to both Rosenthal and Riker.

In April 2012, Rosenthal filed a complaint of foreclosure against Vanessa Benun, her husband Elan Broochian, and Riker. Vanessa Benun and Elan Broochian did not respond to the complaint, and Rosenthal filed a request to enter default judgment against them. Riker answered the complaint and pleaded affirmative defenses, including that its 2007 mortgage has priority over Rosenthal's 2000 and 2005 mortgages. In February 2013, both Rosenthal and Riker filed motions for summary judgment on the priority issue.

On April 26, 2013, the Chancery Division granted Rosenthal's motion, struck Riker's answer with prejudice, and entered default against Riker as if no answer had been filed in the foreclosure action. The court then remanded the matter to the Office of Foreclosure. On February 20, 2014, a final judgment in foreclosure was issued, which ordered "the mortgage premises be sold to raise and satisfy the several sums due, in the first place, to [Rosenthal] in the sum of $2,613,972.60 as of January 13, 2014 . . . ." Riker filed a timely Notice of Appeal challenging the priority granted to Rosenthal by the court's April 26, 2013 order.

Relying on the law of mortgages that secure future advances, Riker argues its later-recorded mortgage has priority over the optional advances Rosenthal made to the Jazz entities after Rosenthal had actual notice of the Riker mortgage. In response, Rosenthal relies on the sequence of the recordings and on the concept of "first in time, first in right" to argue for its priority over the Riker mortgage.

"Future advance mortgages typically provide that 'the property encumbered by the mortgage stands as security not only for the funds advanced at the time the mortgage is executed and delivered, but also for any obligations incurred after the initial advance.'" Cox v. RKA Corp., 164 N.J. 487, 524 (2000)

(Stein, J., concurring in part and dissenting in part) (quoting James B. Hughes, Future Advance Mortgages: Preserving the Benefits and Burdens of the Bargain, 29 Wake Forest L. Rev. 1101, 1101 (1994)).

Many years ago in Ward v. Cooke, 17 N.J. Eq. 93, 99 (Ch. 1864), the Chancellor held that future advance mortgages are not subordinated except as to advances made after the mortgagee receives actual notice of the subsequent lien or encumbrance. The Chancellor held that constructive notice is insufficient to subordinate the priority of a future advance mortgage. Ibid.

Ward remained unchallenged as the rule in New Jersey until 1982, when the Chancery Division analyzed the effect of recording statutes enacted after Ward in the context of a construction loan. Lincoln Fed. Sav. & Loan Assoc. v. Platt Homes, Inc., 185 N.J. Super. 457, 464-67 (Ch. Div. 1982). The court in Lincoln Federal held that constructive notice through the recording of a subsequent mortgage would also suffice to give the later mortgage priority where the future advances on the earlier mortgage were optional, not obligatory. Id. at 461-65 (citing Mayo v. City Nat'l Bank & Trust Co., 56 N.J. 111, 117 (1970); Micele v. Falduti, 101 N.J. Eq. 103, 104-05 (Ch. 1927)).[3]

_____

[3] Though not pivotal to the issue before us, Lincoln Federal's holding on constructive notice departs from the majority of
                                                    (continued)

In _Cox_, _supra_, 164 _N.J._ at 525, Justice Stein's concurring and dissenting opinion explained the distinction drawn in _Lincoln Federal_ and other cases with reference to the earlier mortgagee's contractual obligation:

> the determination of the lien priority of future advance mortgages against a subsequent lien holder turns on whether the advances are obligatory or optional and what constitutes notice to the future advances mortgagee. . . . [I]f a mortgagee is contractually obligated to make advance[s], those advances will be senior to any intervening lien irrespective of notice.
>
> [_Ibid._ (citing Nelson & Whitman, _supra_, 44 _Duke L.J._ at 669).]

The Chancery Division in _Lincoln Federal_ explained the priority rule in terms of the lender's commitment to make future advances:

> Thus, where the mortgagee is committed under a recorded mortgage to lend a specific sum, and where several advances are required to consummate the agreement, the court will give effect to the manifest intention of the parties and will treat successive advances as a single transaction, fixed and effective as of the date the original commitment was recorded.

---

(continued)
American jurisdictions, which "require that the first mortgagee have _actual_ notice of the subsequent lien before [its] claim will be subordinated." _Cox_, _supra_, 164 _N.J._ at 526 (Stein, J., concurring in part and dissenting in part) (citing cases); _see also_ 29 _New Jersey Practice, Law of Mortgages_ § 10.13 (finding unpersuasive _Lincoln Federal_'s rationale for departing from the actual notice requirement of _Ward_).

> [Lincoln Fed., supra, 185 N.J. Super. at 462
> (citing Micele, supra, 101 N.J. Eq. at 104;
> Cent. Trust Co. v. Cont'l Iron Works, 51
> N.J. Eq. 605, 608 (E. & A. 1893)).]

Specifically relevant to the issue in this appeal, the Chancery Division stated: "When the future advance is optional on the part of the mortgagee, the rule is clear: actual notice of an intervening encumbrance will work a subordination of any advances made after such notice is received." Ibid.; see also Mayo, supra, 56 N.J. at 117 ("Where it is optional with the mortgagee whether to make future advances, he does not have a prior lien for those advances made after notice of an existing encumbrance.") (citing Germania Bldg. & Loan Ass'n v. B. Fraenkel Realty Co., 82 N.J. Eq. 49 (Ch. 1913), aff'd, 84 N.J. Eq. 164 (E. & A. 1915)).

These common law rules of priority place Riker ahead of Rosenthal as to any optional future advances that Rosenthal made to the Jazz entities after it had actual notice of the Riker mortgage.

The evidence is undisputed that all the advances Rosenthal made to the Jazz entities were made at its option; they were not obligatory. Not only did paragraphs 7(b) and 7.2 of the factoring agreements reserve to Rosenthal "discretion" to grant the advances, but also Rosenthal's advances were secured by the

dragnet clauses of the Rosenthal mortgages.  Because dragnet clauses are generally included in a loan agreement when a lender is under no obligation to make any additional loans, subsequent advances are virtually always optional rather than obligatory. Nelson & Whitman, supra, 44 Duke L.J. at 671-72.

In addition to Rosenthal's advances being optional, all the advances upon which it now seeks to collect occurred after August 2007, that is, after it had actual knowledge of the Riker mortgage.  At oral argument before us, Rosenthal acknowledged that the entirety of its claim of almost four million dollars arises from such optional advances made after its counsel's e-mail of August 2007, in which Rosenthal indicated its actual knowledge of the Riker mortgage.  Because Rosenthal made optional advances with actual knowledge of Riker's subsequent mortgage, the common law gives priority to the Riker mortgage over the earlier Rosenthal mortgages.

This conclusion is consistent with the result reached by the Chancery Division in Lincoln Federal.  There, Platt Homes, Inc. owned five lots that it planned to develop, and Robert Hedges was an investor in Platt's development plan.  Lincoln Fed., supra, 185 N.J. Super. at 459.  In May 1979, Platt obtained a construction loan from Lincoln Federal Savings & Loan Association providing for discretionary advances of up to

$94,500 and secured by a recorded mortgage executed by Platt on the property. Ibid. Also in May 1979, Lincoln Federal made an initial advance to Platt of $39,500. Ibid. In July 1979, Hedges lent Platt an additional $10,000 beyond his investment in exchange for a mortgage to him, which Hedges promptly recorded. Ibid. In August 1979, Lincoln Federal made a second advance of $27,200 to Platt. Ibid. Platt defaulted on both mortgages. Hedges conceded the priority of Lincoln Federal's initial $39,500 advance, but argued his intervening mortgage was superior to the $27,200 optional second advance made by Lincoln Federal. Ibid.

The Chancery Division surveyed the law on future advance mortgages, id. at 459-63, and granted priority to Hedges' recorded mortgage over the subsequent advances Lincoln Federal made, id. at 465. The court suggested a construction lender could conduct a run-down search of the property and obtain the subordination of any intervening lienholders before releasing any additional optional funds. Id. at 467.

Rosenthal points out that Lincoln Federal pertained to a construction loan and its holding was not intended to extend to security for commercial lending transactions such as in this case. Rosenthal relies on a footnote in the Lincoln Federal opinion, which states in part:

> The court recognizes, however, that this holding cannot apply in general commercial loan situations, where commitments to make future advances may be secured by rapidly fluctuating collateral, such as inventory, accounts receivables or the like, with a mortgage on real property taken as side collateral only. In such situations the position of the first secured party to file is protected as to nonreal property collateral by the Uniform Commercial Code, N.J.S.A. 12A:9-312(5) and 12A:9-312(7). He may then "make subsequent advances without each time having, as a condition of protection, to check for filings later than his." New Jersey Comment 5 to N.J.S.A. 12A:9-312(5). Thus, the lender's priority as to all advances relates back to the time of filing. A real estate mortgage given as additional collateral for such a loan or as security for a guaranty of such a loan is generically different from a construction mortgage, and thus can be governed by different standards.
>
> [Id. at 467 n.5.]

In this case, the Chancery Division took note of the disclaimer contained in the Lincoln Federal footnote and concluded the body of law on future advance mortgages does not apply because this case does not pertain to a construction loan. Our review of the case law does not reveal such a limitation on the common law rule of priorities where the future advance mortgagee has actual knowledge of the intervening lien.

Construction loans are one type of future advance mortgage. Lines of credit, open-end lending agreements, and dragnet clauses are also types of future advance mortgages. Nelson &

Whitman, supra, 44 Duke L.J. at 670-73.  The first mortgages in Ward and a number of other cases that granted priority to subsequent mortgages or liens did not involve construction loans.  See Ward, supra, 17 N.J. Eq. 93; Lanahan v. Lawton, 50 N.J. Eq. 276 (Ch. 1892), aff'd o.b. sub nom. U.S. Trust Co. of N.Y. v. Lanahan, 50 N.J. Eq. 796 (E. & A. 1893); Heintze v. Bentley, 34 N.J. Eq. 562 (E. & A. 1881); Jacobus v. Mut. Benefit Life Ins. Co., 27 N.J. Eq. 604 (E. & A. 1876); Griffin v. N.J. Oil Co., 11 N.J. Eq. 49 (Ch. 1855).  Although these precedents date from the nineteenth century, they have not been overruled or superseded by any case or statute that has been brought to our attention.

The quoted footnote in Lincoln Federal sought to restrict the holding of that case to construction loan mortgages, but we must keep in mind that the holding of Lincoln Federal is that constructive notice suffices to grant priority to the subsequent mortgagee.  That holding should not apply to other types of commercial lending transactions because of the frequency and rapidity of future advances given in many such transactions.  It would be impractical to expect a commercial lender such as Rosenthal to conduct a search of intervening recorded encumbrances every time another advance is made in a transaction such as the factoring agreements of this case.

A-2890-13T3

Here, Riker does not claim priority because it recorded its mortgage in April 2007 and thus provided constructive notice to Rosenthal. It claims priority because Rosenthal had actual notice of the Riker mortgage, and yet, Rosenthal continued to make optional advances to one or more of the Jazz entities without first assuring that the Riker mortgage would be deemed subordinate to Rosenthal's prior mortgages. It is only the combination of Rosenthal's actual notice and optional advances that establishes Riker's priority under the common law.

Also, in the factual circumstances of this case, the common law priority rule was not abrogated by the Legislature's 1985 enactment of N.J.S.A. 46:9-8.1 to -8.5 and the amendments to those statutes in 1992, 1997, and 1998. That legislation preserves the priority of earlier recorded mortgages by relating back to the original date of recording certain modifications of mortgage loans and lines of credit. 29 New Jersey Practice, Law of Mortgages § 10.13.

N.J.S.A. 46:9-8.2 states in pertinent part:

> Notwithstanding any other law to the contrary, the priority of the lien of a mortgage loan which has undergone a modification, as defined by this act, shall relate back to and remain as it was at the time of recording of the original mortgage as if the modification was included in the original mortgage or as if the modification occurred at the time of recording of the original mortgage.

A-2890-13T3

"Mortgage loan" as used in this statute is defined as "any loan or line of credit, <u>except a construction loan</u>, which states a maximum specified principal amount and which is secured by an interest in real property." <u>N.J.S.A.</u> 46:9-8.1(a) (emphasis added). That definition applies to Rosenthal's 2000 and 2005 mortgages. However, the type of modification that relates back to the original execution of the mortgage loan does not include future advances. That is because "modification" is defined by the statute as "a change in the interest rate, due date or other terms and conditions of a mortgage loan <u>except an advance of principal</u> . . . ." <u>N.J.S.A.</u> 46:9-8.1(d)(1) (emphasis added).

As argued by Riker, the 1997 amendment of the statute temporarily added such advances of principal to the definition of "modification" of a mortgage loan that would relate back to the date of its recording and thus give it priority over subsequent mortgages. <u>L.</u> 1997, <u>c.</u> 427, § 1(d). However, the 1998 amendment revised the statute again by redefining "modification" to include an advance of principal only with respect to a "line of credit." <u>L.</u> 1998, <u>c.</u> 130, § 1(d).[4]

---

[4] After the 1998 amendment, <u>N.J.S.A.</u> 46:9-8.1(d) states in full:

"Modification" means:

(continued)

Therefore, the only lasting change the legislation made as to the meaning of "modification" was with respect to lines of credit. 29 <u>New Jersey Practice, Law of Mortgages</u> § 10.13. Rosenthal's advances in this case were not provided on a line of credit. They were granted on a "mortgage loan" as defined in <u>N.J.S.A.</u> 46:9-8.1(a).

Rosenthal argues that Riker was on notice of the earlier-recorded Rosenthal mortgages and had notice of their anti-subordination clauses. Riker responds that it was not a party

---

(continued)

      (1) With respect to a <u>mortgage loan</u> other than a line of credit, a change in the interest rate, due date or other terms and conditions of a mortgage loan <u>except an advance of principal</u>; or

      (2) With respect to a <u>line of credit</u>, a change in the interest rate, due date or other terms and conditions <u>and an advance of principal made pursuant to the line of credit</u> but only to the extent that the advance does not cause the principal balance due to exceed the principal amount stated in the line of credit plus accrued interest;

      (3) Payments for taxes, assessments and insurance and other payments made by the mortgagee pursuant to the terms of the mortgage or line of credit are included with the amounts which have priority pursuant to section 2 of <u>P.L.</u> 1985, <u>c.</u> 353 (<u>C.</u> 46:9-8.2) and are not included in the phrase "advance of principal;"

      (4) "Modification" does not include a substitution in the collateral.

      [(Emphasis added.)]

to and is not bound by the terms of the Rosenthal mortgages. Assuming that constructive notice of the anti-subordination clauses is sufficient, there is no evidence that Riker had actual or constructive knowledge of the amount of the indebtedness of the Jazz entities to Rosenthal in April 2007 when Vanessa Benun executed the Riker mortgage.

Rosenthal, on the other hand, had actual knowledge of the Riker mortgage no later than August 2007 and the varying amounts of the Jazz entities' indebtedness to Rosenthal. Rosenthal was in a position to avoid subordination of its future advances simply by declining to make additional advances until the Riker mortgage might expressly be made subordinate to the Rosenthal mortgages. By failing to take such a step, Rosenthal subjected itself to the application of the common law rules on priorities.

Rosenthal's remedy for violation of the anti-subordination clauses lies with Vanessa Benun, not with Riker. Rosenthal took no action to protect its interests until Jazz Products defaulted under the factoring agreement in December 2009. During those two years, Rosenthal did not declare the Jazz entities or Vanessa Benun to be in default of their agreements, or seek discharge or subordination of the Riker mortgage. In fact, it continued to make advances to the Jazz entities despite its actual knowledge of the Riker mortgage.

We emphasize that our conclusion that Riker has priority does not subordinate any existing debts of the Jazz entities or Vanessa Benun at the time the subsequent Riker mortgage was executed. As in Lincoln Federal, supra, 185 N.J. Super. at 459, any advances from Rosenthal that preceded Rosenthal's actual knowledge of the Riker mortgage had priority over it. Only the optional advances that Rosenthal made after it knew of the Riker mortgage are subordinate to the Riker mortgage.

Finally, Rosenthal argues that it seeks priority on the basis of Vanessa Benun's guarantees and not on the basis of future advances made pursuant to its factoring agreements. Vanessa Benun's guarantee agreements, however, also guaranteed the optional future advances Rosenthal made after it had actual knowledge of the Riker mortgage. The guarantee agreements do not change application of the common law priority rules.

Reversed and remanded for entry of an amended final judgment of foreclosure granting priority to Riker over the Rosenthal mortgages. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2890-13T3