SYLLABUS

(This syllabus is not part of the opinion of the Court.  It has been prepared by the Office of the Clerk for the convenience of the reader.  It has been neither reviewed nor approved by the Supreme Court.  Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**Rosenthal & Rosenthal, Inc., v. Vanessa Benun, et al. (A-6-15) (076266)**

**Argued April 26, 2016 -- Decided July 21, 2016**

**CUFF, P.J.A.D. (temporarily assigned), writing for a unanimous Court.**

The issue in this appeal is the priority of mortgages securing optional future advances when a factor has advance notice of an intervening lien but nonetheless proceeds to make optional advances to a commercial entity.

On July 12, 1995, Jazz Photo Corp., one of several commercial entities (collectively referred to as the Jazz Entities), entered into a factoring agreement with Rosenthal & Rosenthal, Inc. (Rosenthal).  Jazz Photo sold Rosenthal its accounts receivable in return for cash.  The agreement contemplated the disbursement of additional advances.  Five years later, Vanessa Benun (Benun), the daughter of Jack Benun, a principal of the Jazz Entities, guaranteed Jazz Photo's obligations under that agreement.  Benun also executed a mortgage on real property she owned in Monmouth County as security for her personal guaranty.  The mortgage secured "all sums due or that may become due under this Mortgage, the Guaranty and other Loan Documents (and all extensions, renewals, restatements, substitutions, amendments and modifications of any or all of the foregoing), up to a maximum principal amount of One Million ($1,000,000) Dollars[.]"  The mortgage also contained anti-subordination clauses.  It was recorded in the Monmouth County Clerk's Office on August 21, 2000.

In March 2005, another of the Jazz Entities, Ribi Tech Products, LLC (Ribi Tech), entered into a factoring agreement with Rosenthal.  This factoring agreement also provided for discretionary capital advances from time to time, if Ribi Tech so requested and certain conditions were met.  Benun personally guaranteed Ribi Tech's obligations to Rosenthal.  Benun executed another mortgage on the same Monmouth County real property to secure her guaranty, containing the same provisions as the 2000 mortgage.  This mortgage was recorded in the Monmouth County Clerk's Office on April 12, 2005.

In March 2007, Riker, Danzig, Scherer, Hyland & Perretti, L.L.P. (Riker), a law firm providing legal services to Jack Benun and the Jazz Entities, obtained a third mortgage from Benun on the same real property.  This mortgage was executed in favor of Riker to secure Jack Benun's personal debt under a letter agreement dated March 20, 2007.  When Benun executed the mortgage, Jack Benun owed Riker $1,679,701.33 in unpaid legal fees, and the letter agreement reflected his obligations to Riker and Riker's promise to provide continuing legal representation.  Riker's mortgage was recorded on April 13, 2007.

Rosenthal received actual notice of the Riker mortgage, as reflected in an August 2007 email from Rosenthal's counsel to Riker stating that the "title on the daughter[']s properties show[s] liens in favor of your firm.  Those liens will need to be fully subordinated to any new [Rosenthal] mortgages on the daughter[']s properties related to the new loan to Mona Benun."  Even with notice of the Riker mortgage, Rosenthal continued to make advances to the Jazz Entities that totaled millions of dollars.  In September 2009, Jazz Products filed for bankruptcy.  The Jazz Entities defaulted on their obligations to Rosenthal, owing Rosenthal close to $4 million.  Benun, in turn, defaulted on her personal guaranty to secure the debt.

After Riker recorded its mortgage on the Monmouth County property, it continued to perform legal services for Jack Benun, and his unpaid legal fees ballooned to over $3 million.  Jack Benun and the Jazz Entities defaulted on their obligation to Riker, and Benun defaulted on her guaranty.  The debt secured by the three mortgages totaled close to $7 million, far in excess of the value of the mortgaged property.  Rosenthal filed a foreclosure complaint against Benun, her husband, and Riker.  Benun and her husband did not respond, and Rosenthal requested that a default judgment be entered against them.  Riker answered, disputing the priority of Rosenthal's mortgages.  Later, both Rosenthal and Riker filed cross-motions for summary judgment regarding the priority of their respective mortgages.

The trial court granted Rosenthal's motion for summary judgment.  It held that Riker's argument that its mortgage displaced the two Rosenthal mortgages was legally flawed because the firm accepted a mortgage on the property with knowledge of two prior mortgages, each securing an obligation of up to $1 million, and with knowledge of the anti-subordination clauses.  The court concluded that there was no convincing justification for rewarding Riker -- a subsequent mortgagee -- a superior priority.

Riker appealed, and the Appellate Division reversed in a published opinion. 441 N.J. Super. 184 (App. Div. 2015). The Appellate Division concluded that the common law rules of priority placed Riker ahead of Rosenthal. The panel relied on the long-standing New Jersey rule governing future advance mortgages: when the future advance is optional, actual notice of an intervening lien will subordinate advances made after such notice is received.

The Supreme Court granted Rosenthal's petition for certification. 223 N.J. 281 (2015).

**HELD:** When a lender holds a mortgage that secures optional future advances, the prior lien loses priority for advances made after actual notice of an intervening mortgage, in this case Riker's intervening lien.

1. There are, broadly speaking, two considerations that bear on the priority issue: (1) whether the first mortgagee's subsequent advances were optional or obligatory; and (2) whether the first mortgagee had notice, either actual or constructive, of the intervening mortgage. Under the traditional common law rule, if the advances are obligatory, the first mortgagee retains priority for all advances over all subsequent mortgagees, regardless of whether the first mortgagee had notice of an intervening lien. But if the advances are optional, then the first mortgagee retains priority only for advances made before the mortgagee had notice -- usually actual notice -- of the second, intervening mortgage. (pp. 13-15)

2. For the most part, New Jersey law tracks the optional/obligatory and notice/no-notice common law distinctions governing future advance mortgages. In Ward v. Cooke, 17 N.J. Eq. 93, 99 (Ch. 1864), the court held that a future advance mortgage "is entitled to priority over subsequent encumbrances, for all advances made prior to notice of the subsequent encumbrance." Only actual notice, not record or constructive notice, would suffice. Ibid. The Ward rule has been continuously recognized as the general rule in this State. In Lincoln Federal Savings & Loan Ass'n v. Platt Homes, Inc., 185 N.J. Super. 457, 466-67 (Ch. Div. 1982), the trial court permitted subordination of optional future advances secured by a prior mortgage to an intervening mortgage based on constructive rather than actual notice of the intervening lien, but limited the rule to construction loans. Lincoln Federal has been roundly criticized; nonetheless this Court cited the case with approval in Cox v. RKA Corp., 164 N.J. 487 (2000), albeit in a different context from the traditional advance money mortgage. (pp. 15-24)

3. New Jersey's mortgage-priority statute, N.J.S.A. 46:9-8 to -8.5, preserves priority only for future advances made under a line-of-credit agreement, which are by definition mandatory, thereby denying priority to discretionary principal advances. Because the common law rule protected the priority of mandatory future advances, the statute does little to change the future advance priority common law rule. In other words, optional future advances made with actual knowledge of an intervening lien are subordinated to the intervening lien. (pp. 24-29)

4. The general rule that a mortgage given to secure future advances retains its priority over a subsequent encumbrance only if the future advance is mandatory or if the prior mortgagee did not have actual notice of the intervening lien was established in Ward, supra, 17 N.J. Eq. at 99. That rule remains in effect except as altered by Lincoln Federal for construction loans. Rosenthal's reliance on the Lincoln Federal exception, however, is misplaced. The common law rule -- that actual notice of an intervening lien subordinates a mortgage securing optional future advances -- remains in effect in New Jersey, at least outside the construction-loan context. Lincoln Federal and Cox, supra, did nothing to cast doubt on the common law rule's continuing vitality as to financing vehicles such as factoring agreements or the optional/obligatory distinction regarding future advances. (pp. 29-35)

5. The common law rule grew out of a concern that a prior lender could preclude a borrower from obtaining capital to meet the needs of its business. The circumstances attendant to the execution of the mortgage in favor of Riker in this case are akin to the need for financing to continue business operations under more favorable terms. Once Rosenthal had actual notice of Riker's intervening mortgage and continued to make advances to the Jazz Entities, it subjected itself to the common law priority rules. The amount that Rosenthal now claims has priority over the Riker mortgage was not only advanced at Rosenthal's discretion but also advanced after actual notice of Riker's mortgage. Those sums are therefore subordinated to the Riker mortgage. (pp. 35-36)

The judgment of the Appellate Division is **AFFIRMED**.

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, FERNANDEZ-VINA, and SOLOMON join in JUDGE CUFF's opinion. JUSTICES ALBIN and PATTERSON did not participate.**

ROSENTHAL & ROSENTHAL, INC.,

    Plaintiff-Appellant,

        v.

VANESSA BENUN (a/k/a VANESSA
BROOCHIAN and ELAN
BROOCHIAN),

    Defendants,

        and

RIKER, DANZIG, SCHERER,
HYLAND & PERRETTI, L.L.P.,

    Defendant-Respondent.


        Argued April 26, 2016 – Decided July 21, 2016

        On certification to the Superior Court,
        Appellate Division, whose opinion is
        reported at 441 N.J. Super. 184 (App. Div.
        2015).

        Joshua A. Zielinski argued the cause for
        appellant (McElroy, Deutsch, Mulvaney &
        Carpenter, attorneys; Mr. Zielinski and
        Peter Saad, of counsel; Mr. Zielinski,
        Andrew Gimigliano, and Young Yu, on the
        briefs).

        Matthew H. Lewis argued the cause for
        respondent (Riker, Danzig, Scherer, Hyland &
        Perretti, attorneys; Mr. Lewis, Gerald A.
        Liloia and Nicholas Racioppi, Jr., of
        counsel).

Mark Salah Morgan argued the cause for amicus curiae New Jersey Bankers Association (Day Pitney, attorneys; Mr. Morgan, Christina A. Parlapiano, and Alba V. Aviles, of counsel and on the brief).

Edward C. Eastman argued the cause for amicus curiae New Jersey Land Title Association (Davison, Eastman & Munoz, attorney; Michael J. Fasano, on the brief).

JUDGE CUFF (temporarily assigned) delivered the opinion of the Court.

This appeal addresses the priority of mortgages given to secure financing for a group of related commercial entities. A factor purchased accounts receivable, advanced funds to the commercial entities, and agreed to make optional future advances. The financing was secured by personal guaranties and mortgages on the home of a guarantor. Each mortgage was capped at $1 million.

Before the factor made additional advances to the commercial entities, it received actual notice that a law firm representing the principal of the commercial entities had obtained a mortgage on the home of the personal guarantor to secure payment of current and future legal fees. Notwithstanding actual notice of the intervening mortgage, the factor advanced additional funds. Eventually, the commercial entities defaulted and filed a bankruptcy petition. The guarantor also defaulted. At that time, the amount of

2

indebtedness to the factor and to the law firm far exceeded the value of the security.

The factor commenced an action to foreclose on the mortgages it held. Although the guarantor did not appear in the foreclosure action, the law firm appeared to contest the priority of the liens on the secured property. The law firm contended that the factor's prior liens securing any funds advanced by the factor after receipt of actual notice of the law firm's intervening lien were subordinated to the law firm's mortgage.

The law governing mortgages securing optional, sometimes referred to as discretionary, future advances in this State is well-settled. When a lender holds a mortgage that secures optional future advances, the prior lien loses priority for advances made after actual notice of an intervening mortgage. Although the common law rule and the mortgage-priority statutory scheme adopted by the Legislature have been criticized by commentators and differ from the law in other states, any fundamental alteration of the law governing the priority of mortgages is best addressed by the Legislature.

Here, it is undisputed that the factor had advance notice of the law firm's intervening lien but nonetheless proceeded to make optional advances to the commercial entities. Having done so, its mortgages securing those optional future advances were

subordinated to the law firm's intervening lien.  Accordingly, we affirm the judgment of the Appellate Division, holding that the law firm's intervening lien takes priority over optional advances made by the factor after it received actual notice of the intervening lien.

## I.

On July 12, 1995, Jazz Photo Corp., one of several commercial entities (collectively referred to as the Jazz Entities), entered into a factoring agreement with Rosenthal & Rosenthal, Inc. (Rosenthal).  Jazz Photo sold Rosenthal its accounts receivable in return for cash.  The agreement contemplated the disbursement of additional advances and provided as follows:  "If you require funds from time to time, we will advance to you, at our discretion, up to seventy percent (70%) of the net amount of receivables purchased by us and not yet collected."

Five years later, Vanessa Benun (Benun), the daughter of Jack Benun, a principal of the Jazz Entities, guaranteed Jazz Photo's obligations under that agreement.  At that time, Benun also executed a mortgage on real property she owned in Monmouth County as security for her personal guaranty.  The mortgage secured "all sums due or that may become due under this Mortgage, the Guaranty and other Loan Documents (and all extensions, renewals, restatements, substitutions, amendments

and modifications of any or all of the foregoing), up to a maximum principal amount of One Million ($1,000,000) Dollars[.]" Benun's mortgage also contained "dragnet" and anti-subordination clauses. The dragnet clause provided that the mortgage would secure not only the present guaranty but also "all obligations and indebtedness of every kind" that Benun would incur to Rosenthal in the future. The anti-subordination clause prevented Benun from further mortgaging or encumbering the property. The mortgage was recorded in the Monmouth County Clerk's Office on August 21, 2000.

In March 2005, another of the Jazz Entities, Ribi Tech Products, LLC (Ribi Tech),[1] entered into a factoring agreement with Rosenthal. This factoring agreement also provided for discretionary capital advances from time to time, if Ribi Tech so requested and certain conditions were met. Benun personally guaranteed Ribi Tech's obligations to Rosenthal. Benun executed another mortgage on the same Monmouth County real property to secure her guaranty. This mortgage contained the same provisions as the 2000 mortgage, and it was recorded in the Monmouth County Clerk's Office on April 12, 2005.

In March 2007, Riker, Danzig, Scherer, Hyland & Perretti, L.L.P. (Riker), a law firm providing legal services to Jack

---

[1] Ribi Tech later changed its name to Jazz Products.

5

Benun and the Jazz Entities, obtained a third mortgage from Benun on the same real property. This mortgage was executed in favor of Riker to secure Jack Benun's personal debt under a letter agreement dated March 20, 2007. When Benun executed the mortgage, Jack Benun owed Riker $1,679,701.33 in unpaid legal fees, and the letter agreement reflected his obligations to Riker and Riker's promise to provide continuing legal representation. Riker's mortgage was recorded on April 13, 2007.

Rosenthal received actual notice of the Riker mortgage, as reflected in an August 2007 email from Rosenthal's counsel to Riker. Sent in connection with a contemplated new loan from Rosenthal to the Benuns or the Jazz Entities, the email stated that the "title on the daughter[']s properties show[s] liens in favor of your firm. Those liens will need to be fully subordinated to any new [Rosenthal] mortgages on the daughter[']s properties related to the new loan to Mona Benun."

Even with notice of the Riker mortgage, Rosenthal continued to make advances to the Jazz Entities that totaled millions of dollars.[2] In September 2009, Jazz Products filed for bankruptcy.

---

[2] The outstanding balances on advances made by Rosenthal to the Jazz Entities following actual notice of the Riker mortgage are as follows:

| | |
|---|---|
| August 2007 | $ 388,921.33 |
| September 2007 | $1,567,387.00 |

6

The Jazz Entities defaulted on their obligations to Rosenthal, owing Rosenthal close to $4 million. Benun, in turn, defaulted on her personal guaranty to secure the debt.

After Riker recorded its mortgage on the Monmouth County property, it continued to perform legal services for Jack Benun, and his unpaid legal fees ballooned to over $3 million. Jack Benun, and the Jazz Entities defaulted on their obligation to Riker and Benun defaulted on her guaranty. Thus, the debt secured by the three mortgages totaled close to $7 million, far in excess of the value of the mortgaged property.

| | |
|---|---|
| October 2007 | $2,048,442.37 |
| November 2007 | $ 872,521.17 |
| December 2007 | $ 797,364.00 |
| January 2008 | $ 513,000.00 |
| February 2008 | $ 996,400.00 |
| March 2008 | $ 191,381.93 |
| April 2008 | $3,907,817.76 |
| May 2008 | $1,276,499.00 |
| June 2008 | $1,312,275.33 |
| July 2008 | $1,794,399.76 |
| August 2008 | $ 797,200.73 |
| September 2008 | $1,723,758.64 |
| October 2008 | $1,841,312.25 |
| November 2008 | $1,049,230.33 |
| December 2008 | $ 960,844.60 |
| January 2009 | $ 393,300.00 |
| February 2009 | $ 474,915.65 |
| March 2009 | $ 611,702.84 |
| April 2009 | $1,226,885.00 |
| May 2009 | $ 612,421.33 |
| June 2009 | $1,319,019.28 |
| July 2009 | $ 312,000.00 |
| August 2009 | $ 75,933.13 |
| September 2009 | $ 3233.33 |
| October 2009 | $ 1125.83 |

7

Rosenthal filed a foreclosure complaint against Benun, her husband, and Riker. Benun and her husband did not respond, and Rosenthal requested that a default judgment be entered against them. Riker answered, disputing the priority of Rosenthal's mortgages. Later, both Rosenthal and Riker filed cross-motions for summary judgment regarding the priority of their respective mortgages.

The trial court granted Rosenthal's motion for summary judgment. The trial court determined that the dragnet clauses in the Rosenthal mortgages were fully enforceable. Turning to the priority issue, the trial court held that Riker's argument that its mortgage displaced the two Rosenthal mortgages was legally flawed because the firm accepted a mortgage on the property with knowledge of two prior mortgages, each securing an obligation of up to $1 million, and with knowledge of the anti-subordination clauses. The court concluded that there was no convincing justification for rewarding Riker -- a subsequent mortgagee -- a superior priority.

Riker appealed, and the Appellate Division reversed in a published opinion. See Rosenthal & Rosenthal, Inc. v. Benun, 441 N.J. Super. 184 (App. Div. 2015). The Appellate Division concluded that the common law rules of priority placed Riker ahead of Rosenthal. The panel relied on the long-standing New Jersey rule governing future advance mortgages: when the future

8

advance is optional, actual notice of an intervening lien will subordinate advances made after such notice is received.  Id. at 190 (citing Ward v. Cooke, 17 N.J. Eq. 93, 99 (Ch. 1864)).

This Court granted Rosenthal's petition for certification. 223 N.J. 281 (2015).  We also permitted the New Jersey Bankers Association (NJBA) and the New Jersey Land Title Association (NJLTA) to appear as amici curiae.

## II.

## A.

Rosenthal focuses on the bargained-for contractual expectations of it, Benun, and the Jazz Entities.  According to Rosenthal, those parties entered into the factoring agreements with the expectation that Rosenthal would maintain a senior interest in the mortgaged property.  By granting Riker priority, Rosenthal contends that the Appellate Division's holding allowed Riker, a stranger to the factoring agreements, to upend those bargained-for expectations.

Recognizing the common law rule, and acknowledging that it is the majority rule, Rosenthal urges, however, that it should not apply here.  Rosenthal emphasizes that the mortgages secured Benun's personal guaranty, not a direct advance money loan.  The Appellate Division, Rosenthal claims, failed to consider that critical distinction.

9

Rosenthal also contends that the Appellate Division failed to consider and give effect to the dragnet clauses contained in the mortgages.  Rosenthal argues that all parties to the Jazz Entities' factoring agreements specifically intended that the dragnet clauses would secure Rosenthal's future credit advances up to a specified amount and would keep Rosenthal's priority position for all advances up to that amount.  Moreover, Benun never contested the validity of the dragnet clauses, and the Appellate Division granted Riker priority without addressing the effect that such clauses have on the common law priority rules.

Finally, Rosenthal argues that the legislative history of the mortgage-priority statute, N.J.S.A. 46:9-8.1 and -8.2, plainly indicates that the Legislature intended to vest all future advances with priority.  Rosenthal contends that a literal reading of the statute may produce the harsh, "inequitable," and "absurd" result of an intervening lien holder taking priority based on constructive notice alone.

B.

Riker asserts that the Appellate Division simply applied a rule that has been the law in New Jersey for the past 150 years: when a lender holds a mortgage that secures discretionary future advances, those advances lose priority when they are made after actual notice of an intervening mortgage.  That rule, according

10

to Riker, stands on strong policy footing and has been codified in the mortgage-priority statutes.

Finally, Riker argues that Rosenthal's focus on the dragnet clauses is misplaced and mischaracterizes the Appellate Division's opinion. Rather, the issue before the trial court, the Appellate Division, and this Court has always centered on the well-settled rules governing the priority of recorded mortgages, not the validity of the factoring agreements.

C.

NJBA highlights the important role that future advances play in the financial industry. It asserts that the Appellate Division's opinion will defeat the primary purpose behind the use of future advances in the banking industry -- allowing "lenders to lend money at the pace often required in commercial transactions, i.e., at the point of economic necessity."

NJBA contends that the Appellate Division's focus on Rosenthal's actual notice of Riker's mortgage overlooks that Riker had actual notice of the Rosenthal mortgage. NJBA argues that Riker should have expected its lien to be subordinate to Rosenthal's two earlier-recorded liens.

NJBA expresses concern about three possible outcomes that could follow from the Appellate Division's decision: (1) lenders may avoid future advance transactions because of the risk that intervening liens will destroy their bargained-for

11

security; (2) lenders will avoid checking title before future advances because, if they do, they risk losing priority; and (3) lenders may be unable to meet the rapidly fluctuating capital needs of borrowers in commercial transactions because of the time it takes to negotiate subordination agreements with intervening lenders. In all those situations, NJBA says that the burden is improperly placed on the first lender, rather than on the intervening lender, who is a newcomer to an existing contractual relationship.

In sum, NJBA argues for a rigid first-in-time, first-in-right rule. According to that rule, a lender that has a recorded mortgage securing future advances up to a specified amount should be treated the same as a lender who advanced the entire loan amount at one time.

NJLTA takes no position on the arguments advanced by either Rosenthal or Riker, but urges the Court to look closely at this case to protect the integrity of the recording system. It maintains that the recording system is "best supported and maintained by a determination that one may rely on the record in determining the priority of advances made under a recorded mortgage."

III.

A.

12

The term "future advance" is interpreted broadly.  It covers "all situations in which a mortgagor's obligation . . . is enlarged after the mortgage becomes effective."  Restatement (Third) of Property: Mortgages § 2.1 cmt. a (1997).  Although that occurs most often when a mortgage secures a future advance loan, "an obligation secured by a mortgage may accrue by virtue of circumstances other than a monetary advance."  Ibid.  A personal guaranty falls under that definition.  See ibid.

In the typical future advance mortgage, "the borrower gives the lender a note and mortgage for the entire loan amount, though the lender will not advance all the funds to the borrower until a future date."  2 Grant S. Nelson et al., Real Estate Finance Law § 12.7 at 263 (6th ed. 2014); see also 29 New Jersey Practice, Law of Mortgages § 10.13 at 673 (Myron C. Weinstein) (2d ed. 2001) (noting future advance mortgage may take two forms:  (1) "[i]t may state the total amount to be secured as if it were a present debt, although in fact some or all of the amount is to be advanced by the mortgagee in the future"; or (2) "it may state that it secures advances to be made in the future, with or without a statement of the amounts to be advanced from time to time and the total amount to be secured by the mortgage").  The mortgaged property "stands as security not only for the funds advanced at the time the mortgage is executed and delivered, but also for any obligations incurred after the

13

initial advance." James B. Hughes, Jr., <u>Future Advance Mortgages: Preserving the Benefits and Burdens of the Bargain</u>, 29 <u>Wake Forest L. Rev.</u> 1101, 1102 (1994).

Future advance mortgages are widespread in the construction-loan context, where the property, and in turn the lender's security interest in it, becomes more valuable as the work moves forward, lessening the risk of disbursing additional funds. 2 Nelson, <u>supra</u>, § 12.7 at 263. Moreover, as in this appeal, such financing vehicles can be used to secure commercial financing devices, such as letters of credit, factoring agreements, or lines of credit with an institutional lender. <u>See</u> <u>id.</u> at 263-64. Whatever their use and whatever their form, future advance mortgages have "substantial" advantages for both the borrower and the lender. <u>Id.</u> at 264. The borrower carries interest only on the funds that are presently needed, avoiding the need to reinvest received yet presently unneeded capital, and "[b]oth parties avoid the expense and paperwork involved in refinancing the initial loan or executing a series of junior mortgages." <u>Ibid.</u> The lender, moreover, can ensure that the initial advances are being put to a proper use before providing more cash to a borrower. A construction lender, for instance, can verify that the work is progressing, that contractors are being paid, and that the project is on budget. <u>See</u> <u>ibid.</u>

The critical issue posed by future advance mortgages, and the one highlighted in this appeal, is the priority of a subsequent mortgage on the property obtained by intervening parties after the first mortgagee's initial advance but before future advances.  That issue is of heightened importance when the value of the mortgaged property is insufficient to cover the outstanding principal of both mortgage loans.  There are, broadly speaking, two considerations that bear on the priority issue:  (1) whether the first mortgagee's subsequent advances were optional or obligatory; and (2) whether the first mortgagee had notice, either actual or constructive, of the intervening mortgage.  See Hughes, supra, 29 Wake Forest L. Rev. at 1103.  Under the traditional common law rule, if the advances are obligatory, the first mortgagee retains priority for all advances over all subsequent mortgagees, regardless of whether the first mortgagee had notice of an intervening lien.  Id. at 1115-16.  But if the advances are optional, then the first mortgagee retains priority only for advances made before the mortgagee had notice -- usually actual notice -- of the second, intervening mortgage.  Ibid.; see also Grant S. Nelson & Dale A. Whitman, Rethinking Future Advance Mortgages: A Brief for the Restatement Approach, 44 Duke L.J. 657, 668-69 (1995).

The policy guiding that rule is straightforward -- to protect the borrower "so that she can borrow from other lenders

and can sell the property." 2 Nelson, supra, § 12.7 at 270. If optional advances were to retain priority over subsequent mortgages, the borrower would be doubly mistreated. The borrower "could not demand the contemplated additional loan funds[,]" because, again, they are made at the lender's discretion. Ibid. Nor could she "obtain financing from another lender, because no one will lend on security that will be reduced or eliminated if the first mortgagee decides to make subsequent advances." Ibid. Vesting the first mortgagee with priority, even over optional advances, thus creates the risk that the borrower will have substantial, but unavailable, equity.

The calculus changes, so the reasoning goes, when the advances are obligatory. Then the borrower "has a legal right" to the lender's performance, lessening the risk of stagnant equity. Ibid. Even if the lender fails to perform because the borrower has become too great a credit risk, "obtaining financing elsewhere normally will be unlikely." Ibid.

That explanation for the optional/obligatory and notice/no-notice distinctions undergirds much of the law governing future advance mortgages. Ibid. The traditional common law rule "protects the mortgagor from being placed in the awkward and unfair position of being unable to use the real estate as security for additional financing, though it has value well in

16

excess of the existing mortgage debt." Ibid. A number of states follow that approach through judicially crafted common law. See, e.g., Idaho First Nat'l Bank v. Wells, 596 P.2d 429, 433 (Idaho 1979) (stating that Idaho follows "general rule in the United States" that if future advance "is optional, and if the mortgagee has notice when the advance is made that a subsequent creditor has acquired an interest in the land, then the advance loses its priority to that creditor" (citation omitted)); Bank of Ephraim v. Davis, 559 P.2d 538, 540-41 (Utah 1977) ("[A]n advance made pursuant to a mortgage to secure future advances which the mortgagee was not obligated to make . . . is subordinate in lien to an encumbrance intervening between the giving of the mortgage and the making of the advance, if the advance was made with actual notice or knowledge of the intervening encumbrance."); Daniels v. Elks Club of Hartford, 58 A.3d 925, 934 (Vt. 2012) (noting that judicial decisions have long recognized optional/obligatory advance distinction). Other states have recognized the rule by statute. See, e.g., 735 Ill. Comp. Stat. 5/15-1302 (stating that, with some exceptions, optional future advances "advanced or applied more than 18 months after a mortgage is recorded . . . shall be a lien as to subsequent purchasers and judgment creditors only from the time such monies are advanced or applied"); Me. Stat. tit. 9-B, § 436(1)(B) ("The priority of . . . future advances shall not

17

include any future optional advances secured by such mortgage made by such institution after any such person, in addition to acquiring such subsequent right or lien, sends to the institution . . . express written notice[.]"); Neb. Rev. Stat. § 76-238.01(3)(b)(ii) ("If any optional future advance is made . . . after receiving written notice of the filing for record of any trust deed, mortgage, lien, or claim against such mortgaged real property, then the amount of such optional future advance shall be junior to such trust deed, mortgage, lien, or claim."); Vt. Stat. Ann. tit. 27, § 410(b)(3)(B) (stating that optional future advances take priority "to the extent of future advances that are outstanding before the mortgagee receives written notice of the intervening interest").

For the most part, New Jersey law tracks those common law distinctions, focusing on whether the subsequent advances were optional or obligatory and whether the first mortgagee had notice of the intervening mortgage. In Ward, supra, 17 N.J. Eq. at 99, the court held that a future advance mortgage "is entitled to priority over subsequent encumbrances, for all advances made prior to notice of the subsequent encumbrance." Only actual notice, not record or constructive notice, would suffice. Ibid.

The Ward rule has been continuously recognized as the general rule in this State. See, e.g., Mayo v. City Nat'l Bank

18

& Trust Co., 56 N.J. 111, 117 (1970) ("Where it is optional with the mortgagee whether to make future advances, he does not have a prior lien for those advances made after notice of an existing encumbrance."); Heintze v. Bentley, 34 N.J. Eq. 562, 566-67 (E. & A. 1881) ("[I]f a first mortgagee ha[s] knowledge of the existence of a second encumbrance upon the estate, he cannot make further loans upon his mortgage to the disadvantage of the second encumbrance, when it is entirely optional with him whether to make further advances or not."); Micele v. Falduti, 101 N.J. Eq. 103, 105 (Ch. 1927) ("The general rule . . . is that a mortgage for future advances becomes an effective lien as to subsequent encumbrances from the date of its record, where the making of advances . . . is obligatory.  But, where the making of future advances is not obligatory, but optional, the mortgage is a prior lien to all subsequent encumbrances until there is actual notice[.]").

In Lincoln Federal Savings & Loan Ass'n v. Platt Homes, Inc., 185 N.J. Super. 457, 466-67 (Ch. Div. 1982), the trial court permitted subordination of optional future advances secured by a prior mortgage to an intervening mortgage based on constructive rather than actual notice of the intervening lien, but limited the rule to construction loans.  The bank advanced a portion of the funds committed for the project retaining the right to make optional future advances.  Id. at 459.  Before the

bank advanced the second installment of construction financing, a third party loaned money to the builder and obtained a mortgage on the real property.  Ibid.  The bank and the third party promptly recorded their respective mortgages contemporaneously with the advance of funds.  Ibid.  The builder defaulted on both loans.  Ibid.

Although the bank lacked actual notice of the third party's mortgage, the trial court declined to follow the common law rule, holding that "constructive notice of intervening liens is sufficient to defeat the priority position of a construction mortgagee as to optional future advances."  Id. at 463-67.  The court reasoned that the bank should be charged with constructive notice of the intervening mortgage because it had been recorded before the bank made its second advance and that notice defeated the priority of the bank as to optional future advances.  Id. at 466-67.  The court justified the departure from the prevailing common law rule because the construction lender can protect its interest by conducting a search prior to each advance and declining to make additional advances if it discovered intervening liens.  Id. at 467.

The trial court, however, limited the scope of its holding to the construction-loan context, explaining that it "cannot apply in general commercial loan situations, where commitments to make future advances may be secured by rapidly fluctuating

20

collateral, such as inventory, accounts receivables or the like, with a mortgage on real property taken as side collateral only." Id. at 467 n.5. In those cases, the future advance lender's priority in the other collateral, the collateral that is not real property, is protected by the Uniform Commercial Code. Ibid. (citing N.J.S.A. 12A:9-312(5) and (7)). That lender can therefore "make subsequent advances without each time having, as a condition of protection, to check for filings later than his." Ibid. (quoting Comment 5 to N.J.S.A. 12A:9-312(5) and (7)).

Lincoln Federal has been roundly criticized. See 29 New Jersey Practice, supra, § 10.13, at 680 (observing that constructive notice doctrine can "as easily be employed to justify the [common law] rule as to challenge it"). Nonetheless, this Court cited Lincoln Federal with approval in Cox v. RKA Corp., 164 N.J. 487 (2000), albeit in a different context from the traditional advance money mortgage.

Cox involved a priority contest between a vendee's lien and an after-acquired construction loan. Id. at 491. In Cox, the plaintiffs entered into a contract with the defendant builder to purchase a lot and to construct a home on that property. Ibid. After the plaintiffs made a $12,000 down payment, ibid., the defendant builder obtained a construction loan from a commercial lender, id. at 492. The construction loan provided for an initial advance of $43,335, and the defendant builder received a

21

second advance of $30,896 a few months later.  Ibid.  The lender received a mortgage on the property, which was duly recorded.  Ibid.  Thereafter, the plaintiffs made several payments not yet due under the terms of their contract with the defendant builder totaling $71,225.53.  Ibid.

The defendant builder breached the contract with the plaintiffs, and defaulted on the construction loan.  Ibid.  The plaintiffs filed a suit demanding specific performance, and the lender initiated foreclosure proceedings.  Ibid.  The plaintiffs amended their complaint, seeking to void the lender's mortgage or, in the alternative, to impress a superior lien on the property for all monies advanced to the defendant builder.  Id. at 492-93.

The trial court entered judgment in favor of the plaintiffs, finding that the lender had taken its mortgage with knowledge of the plaintiffs' equitable interest in the property.  Id. at 493.  The trial court found that the plaintiffs' equitable interest was superior to the lender's mortgage for all amounts that they had advanced to the defendant builder.  Ibid.  A divided Appellate Division panel affirmed.  Ibid.

This Court held that the plaintiffs' interest in the property should be treated as a vendee's lien.  Id. at 497.  Addressing the priority of the plaintiffs' lien vis-à-vis the lender's recorded mortgage, the Court accorded priority to the

22

plaintiffs' $12,000 deposit over the lender's "later-recorded mortgage interest." Id. at 501.

The Court, however, declined to award the same priority to the optional payments made by the plaintiffs toward the purchase price after the mortgage was recorded. Id. at 503-04. The Court reasoned that the plaintiffs had constructive notice of the mortgage interest before making additional payments toward the purchase price. Id. at 502, 504. In so ruling, the Court concluded that the plaintiffs were in the same position as the mortgagee in Lincoln Federal. The Court emphasized that the plaintiffs made "voluntary advances, in addition to their initial deposit, toward the purchase price of the property after [the lender] granted the construction loan to [the builder] and recorded its mortgage." Id. at 503. The holder of a vendee's lien, who makes additional, voluntary advances after notice of an intervening lien, "must be viewed, like the mortgagee in Lincoln, as having made such payments at [its] peril." Id. at 504.

Concurring in part and dissenting in part, Justice Stein maintained that the plaintiffs' payments following recordation of the construction mortgage should also receive priority over the mortgage. Id. at 528-29 (Stein, J., concurring in part and dissenting in part). In doing so, Justice Stein explained that "where the 'first mortgagee has no notice of a subsequent

23

encumbrance, an optional advance will take priority regardless of whether it was made before the intervening lien attached.'" Id. at 525 (quoting La Cholla Grp., Inc. v. Timm, 844 P.2d 657, 659 (Ariz. Ct. App. 1992)). Justice Stein characterized the holding in Lincoln Federal as "in contrast with the majority of American jurisdictions that 'require that the first mortgagee have actual notice of the subsequent lien before [its] claim will be subordinated.'" Id. at 526 (alteration in original) (quoting Hughes, supra, 29 Wake Forest L. Rev. at 1115). Because Lincoln Federal departed from prior New Jersey law, Justice Stein considered the majority's reliance on that case to be misdirected, arguing that the "better rule is that of the majority of jurisdictions which hold that constructive notice of a subsequent and intervening lien is insufficient to deprive parties such as the [plaintiffs] of priority." Id. at 528.

B.

New Jersey's current mortgage-priority statute, N.J.S.A. 46:9-8 to -8.5, grew out of 1985 legislation that was amended twice in the late 1990s. Presently, the statute preserves priority for mortgage loans that have undergone a modification. It provides:

> Notwithstanding any other law to the contrary, the priority of the lien of a mortgage loan which has undergone a modification, as defined by this act, shall relate back to and remain as it was at the time of recording of the

24

> original mortgage as if the modification was included in the original mortgage or as if the modification occurred at the time of recording of the original mortgage. The priority granted by this section shall not apply to any balance due in excess of the maximum specified principal amount which is secured by the mortgage, plus accrued interest, payments for taxes and insurance, and other payments made by the mortgagee pursuant to the terms of the mortgage.
>
> [N.J.S.A. 46:9-8.2 (emphasis added).]

The statutory definition of "modification" includes: (1) "[w]ith respect to a mortgage loan other than a line of credit, a change in the interest rate, due date or other terms and conditions of a mortgage loan except an advance of principal"; and (2) "an advance of principal made pursuant to the line of credit[.]" N.J.S.A. 46:9-8.1(d)(1) and (2) (emphasis added). A "line of credit" is defined as "an agreement whereby a lender is obligated to provide a specified amount of credit to a borrower from time to time." N.J.S.A. 46:9-8.1(c) (emphasis added).

The statutory scheme thus preserves priority only for future advances made under a line-of-credit agreement, which are by definition mandatory. Because the common law rule protected the priority of mandatory future advances, the statute does little to change the future advance priority common law rule. In other words, optional future advances made with actual knowledge of an intervening lien are subordinated to the intervening lien.

25

Interestingly, it appears that the Legislature initially intended to abolish the optional/obligatory distinction and grant priority to the future advance lender for all advances. The Sponsor's Statement provided:

> [L]egal concerns have caused lenders to require additional title searches and title insurance and to require additional document recordings, all with their attendant legal and recording fees causing increased costs for borrowers. The purpose of this bill is to clarify the priority of mortgages upon modification of the mortgage and to eliminate the need for searches and title insurance upon modification, and thus to reduce charges to borrowers. It does this by giving priority to a mortgage, [up] to an amount stated in the mortgage notwithstanding subsequent advances, changes in interest, extension of due date or other modifications.
>
> [Sponsor's Statement to S. No. 2308 (1985) (emphasis added).]

The Senate and Assembly Committee Statements expressed a similar intent:

> The purpose of the bill is to clarify questions regarding the priority of liens which have arisen with the advent of new types of mortgage instruments, such as balloon mortgages, and home equity loans.
>
> It would preserve the priority of the lien of a mortgage loan although . . . advances on the lien may be made (whether obligatory or at the option of the lender). The priority of the lien established at the time of recording would be preserved even in the case of a line of credit when no use of the credit is made.
>
> This bill would not apply (1) to construction loans, (2) to changes in a mortgage involving

26

a substitution of collateral, or (3) to any balance due in excess of the maximum specified principal amount of the mortgage loan, plus certain other payments made by the mortgagee (e.g., accrued interest, taxes, and insurance).

[Assembly Banking & Ins. Comm., Statement to S. No. 2308 (1985) (emphasis added).]

This bill provides that the priority of the lien of a mortgage loan (except a construction loan) in which the interest rate, due date, or other terms and conditions (except substitution of collateral) may be changed or in which advances on the loan, whether obligatory or at the option of the lender, may be made, will retain the same priority as it had when the lien was recorded, even if any of those changes in the mortgage loan occur or advances are not made. However, this priority would not apply to any balance due in excess of the maximum specified principal amount of the mortgage loan, plus certain other payments made by the mortgagee.

[Senate Labor, Indus. & Professions Comm., Statement to S. No. 2308 (1984) (emphasis added).]

The actual words of the statute, however, clash with the Sponsor's Statement and Committee Statements, which purport to preserve priority for all future advances whether optional or obligatory.

The Legislature amended the mortgage-priority statute in 1997, altering the definition of "modification" apparently to include optional principal advances. According to the 1997 amendment, "modification" was defined as

27

> (1) A change in the interest rate, due date or other terms and conditions of a mortgage loan; or
>
> (2) An advance made pursuant to a line of credit <u>or other advance of principal</u> but only to the extent that the advance does not cause the principal balance due to exceed the principal amount stated in the mortgage. "Modification" does not include a substitution in the collateral.
>
> [<u>L.</u> 1997, <u>c.</u> 427, § 1(d) (emphasis added).]

The Sponsor's Statement explains that the bill was designed to clarify "that principal advances on a mortgage are covered as a modification, thereby maintaining the priority of the mortgage, so long as the resulting outstanding principal balance does not exceed the principal amount stated in the mortgage." <u>Sponsor's Statement to Assembly No. 2323</u> (1996); <u>see also</u> <u>Assembly Fin. Insts. Comm., Statement to Assembly No. 2323</u> (1996) (stating same).

That change in the statutory language was short-lived. The next year, the statute reverted to its original 1985 language, thereby denying priority to discretionary principal advances:

> d. "'Modification' means"
>
> (1) With respect to a mortgage loan other than a line of credit, a change in the interest rate, due date or other terms and conditions of a mortgage loan <u>except an advance of principal</u>; or
>
> (2) With respect to a line of credit, a change in the interest rate, due date or other terms and conditions and an advance of principal

28

made pursuant to the line of credit but only to the extent that the advance does not cause the principal balance due to exceed the principal amount stated in the line of credit plus accrued interest.

(3) Payments for taxes, assessments and insurance and other payments made by the mortgagee pursuant to the terms of the mortgage or line of credit are included with the amounts which have priority pursuant to section 2 of P.L.1985, c.353 (C.46:9-8.2) and are not included in the phrase "advance of principal;"

(4) "Modification" does not include a substitution in the collateral.

[L. 1998, c. 130, § 1(d) (emphasis added).]

Moreover, the 1998 amendment's legislative history makes clear it intended to distinguish between advances made under a mortgage loan and advances made under a line of credit. The priority of the original mortgage attaches only to the latter. See Sponsor's Statement to Assembly No. 2077 (1998) ("This bill clarifies that an advance of principal made with respect to a mortgage other than a line of credit does not have the lien priority of the original mortgage; it is not a 'modification' pursuant to P.L.1985, c.353 (C.46:9-8.1 et seq.).").

IV.

The starting point for our resolution of the priority contest between Rosenthal and Riker is the common law rule. The general rule that a mortgage given to secure future advances retains its priority over a subsequent encumbrance only if the

29

future advance is mandatory or if the prior mortgagee did not have actual notice of the intervening lien was established in Ward, supra, 17 N.J. Eq. at 99.  That rule remains in effect except as altered by Lincoln Federal for construction loans.  See Cox, supra, 164 N.J. at 525-26 (Stein, J., concurring in part and dissenting in part) (noting as well-settled that "actual notice of a subsequent encumbrance was required before optional advances would lose their lien priority").

Rosenthal's reliance on this exception in Lincoln Federal, supra, is misplaced because the trial court observed that its holding -- that constructive notice of intervening liens was sufficient to defeat priority -- could not apply to more fluid financing schemes, such as Rosenthal's factoring agreement.  See 185 N.J. Super. at 467 n.5.  In fact, Lincoln Federal acknowledged that an optional advance made in the non-construction lending context following constructive notice only would retain the priority of the earlier mortgage.  Ibid.  Here, however, Rosenthal had actual notice and made subsequent advances notwithstanding that notice.

We also reject Rosenthal's argument that the law of future advance mortgages does not apply to this case because the two mortgages obtained from Benun secured her personal guaranty rather than a direct loan to one of the Jazz Entities.  The term future advance is defined broadly, covering "all situations in

30

which a mortgagor's obligation . . . is enlarged after the mortgage became effective." <u>Restatement</u>, <u>supra</u>, § 2.1 cmt. a. Guaranty agreements fall under the umbrella of that definition, especially guaranty agreements that secure a future advance loan. <u>See</u> <u>ibid.</u> Because the personal guaranty that secured the mortgages could, and did, expand after the mortgage became effective, the law that governs future advance mortgages controls.[3]

Our review of the early case law, including <u>Ward</u> and its progeny, <u>Lincoln Federal</u> and <u>Cox</u>, leads to the conclusion that the common law rule -- that actual notice of an intervening lien subordinates a mortgage securing optional future advances -- remains in effect in New Jersey, at least outside the construction-loan context. Both <u>Lincoln Federal</u> and <u>Cox</u> declined to follow the common law's actual notice requirement in limited circumstances, holding that constructive notice instead sufficed. Those cases, however, did nothing to cast doubt on the common law rule's continuing vitality as to financing

---

[3] We decline to explore the dragnet clause as it affects the priority of the intervening Riker mortgage, because such clauses generally go to the scope of the agreement rather than the priority of prior and intervening liens, and lenders do not consider the dragnet clause as a means to achieve priority over intervening liens. Nelson & Whitman, <u>supra</u>, 44 <u>Duke L.J.</u> at 673-74.

31

vehicles such as factoring agreements or the optional/obligatory distinction regarding future advances.

Moreover, the mortgage-priority statute, specifically N.J.S.A. 46:9-8.2, which gives mortgages that underwent a "modification" priority over intervening liens, defines modification to exclude optional principal advances. Modification of a mortgage loan, other than a line of credit, is defined as "a change in the interest rate, due date or other terms and conditions of a mortgage loan except an advance of principal[.]" N.J.S.A. 46:9-8.1(d)(1) (emphasis added). A modification, as defined by the statute, includes principal advances made only under a line-of-credit agreement. See N.J.S.A. 46:9-8.1(d)(2). Moreover, a line-of-credit agreement is defined as a financing agreement in which "a lender is obligated to provide a specified amount of credit to a borrower from time to time." N.J.S.A. 46:9-8.1(c) (emphasis added). By preserving priority for obligatory advances only, the Legislature left the common law rule untouched.

To be sure, some legislative committee statements from 1985 and 1997 suggest that it intended to end the distinction between optional and obligatory advances. Yet, the language of the legislation adopted in 1985 retained the optional/obligatory distinction. Moreover, the legislative history of the 1998 amendment and the language of that amendment unequivocally

32

restored the distinction and the common law rule of retaining priority only for obligatory future advances.  See Sponsor's Statement to Assembly No. 2077, supra.

The common law rule governing future advance mortgages remains in force in this State.  To be sure, there are policy reasons identified by Rosenthal and amici that question the continuing value of the common law rule and advocate for a rule that eliminates any ambiguity and fosters uniformity of interpretation and application, such as the Restatement.  The common law rule also has been the subject of scholarly criticism.  See, e.g., Hughes, supra, 29 Wake Forest L. Rev. at 1125 ("[T]here should be a strictly defined rule to govern priority in future advance situations, but the present rule which relies upon the optional/obligatory distinction is simply not justified."); Robert Kratovil & Raymond J. Werner, Mortgages for Construction and the Lien Priorities Problem -- The "Unobligatory" Advance, 41 Tenn. L. Rev. 311 (1974) (arguing that traditional optional/obligatory test, as applied to construction context, impedes development); Matthew Lilly, Comment, Subrogation of Mortgages in California: A Comparison with the Restatement and Proposals for Change, 48 UCLA L. Rev. 1633, 1652 (2001) ("While encouraging future loans is sound public policy, making a distinction between optional and obligatory advances creates a cure that is often more onerous

33

than the disease."); Nelson & Whitman, supra, 44 Duke L.J. at 659-60 (arguing that common law approach to priority of mortgages to secure future advances "has proved inadequate and should be discarded").

A number of states have modified or discarded the common law rule. Some states have statutorily redefined "notice" to include only written notice. See, e.g., Me. Stat. tit. 9-B, § 436(1)(B) ("The priority of . . . future advances shall not include any future optional advances secured by such mortgage made by such institution after any such person, in addition to acquiring such subsequent right or lien, sends to the institution . . . express written notice[.]"); Neb. Rev. Stat. § 76-238.01(3)(b)(ii) ("If any optional future advance is made . . . after receiving written notice of the filing for record of any trust deed, mortgage, lien, or claim against such mortgaged real property, then the amount of such optional future advance shall be junior to such trust deed, mortgage, lien, or claim."); Vt. Stat. Ann. tit. 27, § 410(b)(3)(B) (stating that optional future advances take priority "to the extent of future advances that are outstanding before the mortgagee receives written notice of the intervening interest"). Some states have adopted a cutoff notice scheme. See, e.g., Mo. Rev. Stat. § 443.055(6) (stating that mortgagor may give written notice that he "elects to terminate the operation of the instrument as security for future

34

advances"); Nev. Rev. Stat. § 106.380(1) ("A borrower may at any time [give] written notice to the lender stating that the borrower elects to terminate the operation of an instrument as security for future advances[.]"). And some states have abolished the optional/obligatory distinction. See, e.g., N.M. Stat. Ann. § 48-7-9 ("Every mortgage . . . may secure future advances and the lien of such mortgage shall . . . have priority from the time of recording as to all advances, whether obligatory or discretionary, made thereunder[.]"); Or. Rev. Stat. § 86.155(2) (stating that as to "principal advances made any time pursuant to the credit agreement," lien "shall have priority, regardless of the knowledge of the lienholder of any intervening lien, as of its date of recording . . . whether the advances are optional or obligatory advances").

Amici have also advanced persuasive reasons for departing from the common law rule. Where, however, the common law rule governing priority of optional future advances has been codified by statute, any plea to fundamentally alter the rule is best addressed to the Legislature.

V.

In sum, the law permits an intervening lender to insert itself into an existing contractual relationship and achieve priority over an earlier lender who retained the option to advance further funds. The rule grew out of a concern that a

35

prior lender could preclude a borrower from obtaining capital to meet the needs of its business. The circumstances attendant to the execution of the mortgage in favor of Riker are akin to the need for financing to continue business operations under more favorable terms. Here, without some security to cover mounting legal fees, the Jazz Entities may not have been able to obtain legal representation to further their business operations.

Applying the well-settled law concerning the priority of a mortgage securing optional future advances against an intervening lienholder to the facts of this appeal is straightforward. Rosenthal does not dispute that its advances under the factoring agreements were optional. Nor does it dispute that it had actual notice of Riker's mortgage on the Benun property. Once Rosenthal had actual notice of Riker's intervening mortgage and continued to make advances to the Jazz Entities, it subjected itself to the common law priority rules. The amount that Rosenthal now claims has priority over the Riker mortgage was not only advanced at Rosenthal's discretion but also advanced after actual notice of Riker's mortgage. Those sums are therefore subordinated to the Riker mortgage.

## VI.

The judgment of the Appellate Division is affirmed.

CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, FERNANDEZ-VINA, and SOLOMON join in JUDGE CUFF's opinion. JUSTICES ALBIN and PATTERSON did not participate.

36